O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MICHAELA WHITNEY KELLNER,    ) Case No. SACV 12-1457-JPR
                            )
                Plaintiff,   )
                            )
        vs.                  ) MEMORANDUM OPINION AND ORDER
                            ) AFFIRMING THE COMMISSIONER
                            )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social       )
Security,[1]                 )
                            )
                Defendant.   )
                            )

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security Supplemental Security Income benefits ("SSI") and "Disabled Adult Child" benefits ("DAC").[2]  The parties consented to the jurisdiction of

_____

    [1]    On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

    [2]    DAC benefits are available for a disabled child of a person who is deceased or drawing Social Security disability or retirement benefits.  42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5).  To be eligible for DAC benefits, an applicant who is 18 years old or older must have become disabled before age

1

the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed March 11, 2013, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on October 14, 1986.  (Administrative Record ("AR") 643.)  She graduated from college in December 2008.  (AR 88, 647.)  Plaintiff previously worked part time as a retail salesperson and, as part of a school work-study program, as a painting-and-drawing technician and an assistant to her school's English department.  (AR 148-51.)

On February 13, 2009, Plaintiff filed applications for SSI and DAC based on her mother's earnings record.  (AR 14, 25-28, 123, 126.)  She alleged that she had been unable to work since June 6, 2007, when she fell down some stairs, because of "compressed discs in the neck," "degeneration in neck," nerve damage in her left arm and leg, shoulder tendonitis, migraines, nonverbal learning disorder, post-traumatic-stress disorder, depression, and other medical conditions.  (AR 79.)  After Plaintiff's applications were denied, she requested a hearing before an Administrative Law Judge ("ALJ").  (AR 35-36.)  A hearing was held on June 22, 2010, at which Plaintiff, who was represented by counsel, testified, as did a medical expert, Joseph E. Jensen, and a vocational expert.  (AR 641.)  On October

---

22.  42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5).

2

8, 2010, the ALJ issued a written decision finding Plaintiff not disabled.  (AR 14-24.)  On October 25, 2010, Plaintiff requested review of the ALJ's decision.  (AR 9-10.)  On July 18, 2012, the Appeals Council denied review.  (AR 3-6.)  This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial

3

gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

Under Title II of the Social Security Act, a disabled adult whose parent is entitled to Social Security disability insurance benefits may receive DAC benefits if she can show, among other things, that at the time of filing for DAC benefits she was unmarried, dependent on the wage-earning parent, and "under a disability . . . [that] began before [s]he attained the age of 22." 42 U.S.C. § 402(d)(1)(B); 20 C.F.R. § 404.350. To be eligible for benefits, the claimant "must be disabled continuously and without interruption beginning before her twenty-second birthday until the time she applied for child's disability insurance benefits." Smolen v. Chater, 80 F.3d 1273, 1280 (9th Cir. 1996) (emphasis in original).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).[3] In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the

---

[3]   In evaluating a claimant's eligibility for DAC benefits, the ALJ uses the same five-step process as used to evaluate eligibility for disability insurance benefits under Title II of the Social Security Act. See 42 U.S.C. §§ 401 et seq.; 20 C.F.R. §§ 404.301, 404.1520.

claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the

_____

[4]   RFC is what a claimant can do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis.  §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not turned 22 as of June 6, 2007, the alleged onset date, and had not engaged in substantial gainful activity since that date.  (AR 16.)  At step two, the ALJ concluded that Plaintiff had the severe impairments of "status post fall in 2007 with mild cervical spine degenerative disc disease, without evidence of radiculopathy; left shoulder tendonitis; and early bilateral knee degenerative joint changes."  (Id.)  The ALJ found that Plaintiff's mental impairments, including her nonverbal learning disorder, post-traumatic-stress disorder, and depression, were nonsevere.  (AR 17.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 18.)  At step four, the ALJ found that Plaintiff retained the RFC to perform a limited range of sedentary work;[5] specifically, Plaintiff's limitations included

---

[5]   "Sedentary work" is defined as involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a).  Sedentary work involves sitting most of the time but may involve occasional walking or standing for brief periods of time.  Id.

lifting and/or carrying 10 pounds occasionally, less than 10 pounds frequently; stand and walk 2 hours; sit for 6 hours; should have opportunity every 60 minutes at the worksite to change positions briefly for up to 5 minutes; occasional climbing of ramps and stairs; occasional stooping, crouching, kneeling, and crawling; occasional bilateral operation of pedals; upper extremities gross and fine manipulation bilaterally limited to frequent as opposed to constant; avoid reaching with the left upper extremity at or above shoulder level; avoid constant neck motion (flexion, extension or rotation) but can do it on a frequent basis; avoid unprotected heights or moving equipment; and avoid driving.

(AR 19.)  Based on the VE's testimony, the ALJ concluded that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (AR 22-23.)  The ALJ therefore concluded that as to her application for DAC, Plaintiff was not disabled as defined in § 223(d) of the Social Security Act, 42 U.S.C. § 423(d), before turning 22.  (AR 23.)  As to her application for SSI, the ALJ determined that Plaintiff was not disabled under § 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. § 1382c(a)(3)(A).  (AR 24.)

**V.   DISCUSSION**

Plaintiff alleges that the ALJ erred in (1) rejecting the opinions of two of her treating physicians and (2) discounting her subjective symptom testimony.  (J. Stip. at 3.)

A.   <u>The ALJ Properly Evaluated the Medical Evidence</u>

Plaintiff argues that the ALJ failed to give "proper weight"

7

to the opinions of treating physicians Kenneth P. Martinez and

Khang Lai. (J. Stip. at 3.)  Specifically, Plaintiff contends

that in according little weight to those opinions, the ALJ "[did]

not provide a detailed summary of any conflicting medical

evidence except to say that there is no medical evidence showing

Plaintiff has neurological deficits." (J. Stip. at 5.)

Plaintiff further contends that the ALJ erred by relying on the

testimony of medical expert Jensen because he "provide[d] no

independent clinical findings that differ from the findings of

the treating physician." (J. Stip. at 6.)

> 1.   Applicable law

Three types of physicians may offer opinions in Social

Security cases: "(1) those who treat[ed] the claimant (treating

physicians); (2) those who examine[d] but d[id] not treat the

claimant (examining physicians); and (3) those who neither

examine[d] nor treat[ed] the claimant (non-examining

physicians)." Lester, 81 F.3d at 830.  A treating physician's

opinion is generally entitled to more weight than the opinion of

a doctor who examined but did not treat the claimant, and an

examining physician's opinion is generally entitled to more

weight than that of a nonexamining physician.  Id.

The opinions of treating physicians are generally afforded

more weight than the opinions of nontreating physicians because

treating physicians are employed to cure and have a greater

opportunity to know and observe the claimant.  Smolen, 80 F.3d at

1285.  If a treating physician's opinion is well supported by

medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial

evidence in the record, it should be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).  When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion.  Id.  Indeed, the ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

2.  Relevant facts

On February 12, 2007, Plaintiff visited an emergency room, reporting that she had slipped and fallen on a flight of stairs five days earlier.  (AR 522.)  Dr. Michael Jugo noted that Plaintiff "[did] not appear to be in much pain or discomfort" and had full range of motion, "5/5" lower-extremity strength, and some tenderness but no swelling or bruising.  (AR 522-23.)  He

9

diagnosed back contusion and advised her to take ibuprofen.  (AR 523.)

On March 23, 2007, x-rays of Plaintiff's knees showed "[s]mall effusion in the right knee." (AR 233.)  On May 7, 2007, Dr. Alan H. Beyer at Newport Orthopedic Institute diagnosed bilateral-knee chondromalacia patellae[6] and referred her to physical therapy. (AR 409.)  That same day, Dr. Janice S. Young, a board-certified neurologist, found that Plaintiff had normal cranial nerves and sensation, her motor strength in grip and finger abduction was "4/5," and her strength in other muscles was "5/5." (AR 429.)  She concluded that Plaintiff had "subtle neurologic deficits" and referred her for further testing.  (Id.)

On May 14, 2007, a cervical-spine MRI showed "[m]inor degenerative disc changes in the cervical spine without evidence of impingement." (AR 227.)  Lumbosacral-spine, thoracic-spine, and brain MRIs were normal. (AR 225-26, 228.)

On June 8, 2007, Dr. Scott S. Ferer, who was board certified in neurology and psychiatry, found that Plaintiff had reflexes of "2-1/2 to 3+," "mild diffuse upper and lower limb weakness" of "4+ to 5-," intact vibratory sense, "questionable impairment of joint position sense in the feet," normal sensation to light touch and temperature, and normal gait. (AR 216-17.)  Dr. Ferer "suspect[ed] a combination of orthopedic and possibly neurologic impairment." (AR 217.)  He recommended that she increase her

---

[6]    Chondromalacia patella, or patellofemoral pain syndrome, is a general term meaning damage to the cartilage under the kneecap.  Chondromalacia patella, Mayo Clinic, http://www.mayoclinic.com/health/chondromalacia-patella/DS00777 (last updated Feb. 5, 2013).

activity and exercise as much as possible and referred her to a pediatric neurologist.  (Id.)

On June 21, 2007, Dr. Young conducted motor nerve-conduction tests of Plaintiff's left arm and both of her legs, all of which were normal.  (AR 483.)  Dr. Young also noted that Plaintiff had a normal gait, no atrophy, and decreased leg sensation.  (AR 484.)  Her impression was that "clinically, [Plaintiff had] sensory, not motor, neuropathy" and "photo-abnormality on EEG [with] no clear seizures."  (Id.)

On June 26, 2007, Dr. Mary Kay Dyes at Adult & Child Neurology Medical Associates, Inc., noted that Plaintiff had normal motor function, normal muscle strength, and normal vibratory and temperature sensation.  (AR 284.)  Plaintiff had a normal but "occasionally slightly awkward" gait, "[c]orrect position sensation" with "occasionally slow" responses, and "very brisk" reflexes in the knees but normal and symmetrical reflexes in the upper extremities.  (Id.)  Plaintiff performed rapid alternating movements "mildly slowly" and fine-motor movements "somewhat slowly but accurately."  (Id.)  Dr. Dyes's impression was "[o]ccasional unprovoked falling with associated mild incoordination and mild motor clumsiness."  (Id.)  She noted that Plaintiff had been diagnosed with nonverbal learning disability, which was "apparently commonly associated with mild motor clumsiness and visual spatial or visual perceptual deficits along with attention deficit disorder."  (Id.)  Dr. Dyes noted that Plaintiff's MRIs, EEG, and nerve conduction studies all appeared to be normal.  (Id.)  She found that Plaintiff had a "borderline vitamin B-12 level" and started her on weekly B-12 injections.

(AR 284-85.)

On February 29, 2008, Dr. Michael Gordon at Newport Orthopedic Institute found that Plaintiff's cervical-spine and low-back ranges of motion were decreased by 50 percent. (AR 412-13.) Plaintiff had no muscle spasm or tenderness, "5/5" motor function throughout, normal sensory function, normal deep-tendon reflexes, normal vascular examination, a normal gait, and a normal straight-leg-raising test. (AR 411-14.) Dr. Gordon diagnosed chronic left-arm and left-leg pain, numbness, and tingling and "[b]alance disorder of unclear etiology after a bad fall on stairs." (AR 415.) Dr. Gordon also noted that "MRI scan shows no operable lesion and no evidence of neurocompressive lesion." (Id.) He referred Plaintiff back to neurology for EMG studies and continued medication management. (Id.)

On March 17, 2008, a nerve-conduction study and electromyography of Plaintiff's left arm and left leg were normal. (AR 286.) On March 19, 2008, Dr. Gordon noted that Plaintiff had normal EMG and MRI testing. (AR 401.) He stated that "[t]he possibility of thoracic outlet syndrome was brought up" and that "[n]o surgery [was] indicated." (Id.)

On May 16, 2008, Dr. Steven Gausewitz at the Newport Orthopedic Institute noted that Plaintiff complained of left-shoulder and left-leg pain. (AR 416.) He found that Plaintiff had full range of motion of the hip and shoulder and an intact neurologic examination. (Id.) He diagnosed left-shoulder strain and recommended that Plaintiff undergo an MRI. (Id.)

On June 2, 2008, an MRI of Plaintiff's left shoulder revealed findings "compatible with tendinosis" and "[t]race fluid

1  in subacromial subdeltoid bursa." (AR 349-50.) On June 6, 2008,
2  Dr. Gausewitz found that Plaintiff's left shoulder had full range
3  of motion with some pain on resisted abduction and an intact
4  neurovascular examination. (AR 224.) He diagnosed left-shoulder
5  tendinosis and recommended physical therapy. (Id.)

6       On January 8, 2009, Dr. Lai, who was board certified in
7  physical medicine and rehabilitation and pain medicine, noted
8  that Plaintiff was able to walk three blocks; did not use a cane
9  or walker; could bend, stoop, and crawl; and had limited ability
10  to reach above her shoulders.[7] (AR 255, 257.) She had normal
11  range of motion of the spine, normal gait, and normal muscle
12  tone, and she could walk on her heels and toes without
13  difficulty. (AR 256.) Plaintiff's sensation was "diminished to
14  left C6 to light touch," and her reflexes were "0/4 left biceps
15  and 2/4 right" and "2/4 bilat triceps." (Id.) Dr. Lai diagnosed
16  near cardiogenic syncope, cervical-facet spondylosis, cervical-
17  disc displacement, myofacial pain, "myalgia/myositis," and
18  shoulder osteoarthrosis.[8] (AR 257.)

19  _____

20       [7]  Dr. Lai referred to himself as a "board certified
    physiatrist" (AR 594), but the ALJ mistakenly stated that he was
21  a psychiatrist (AR 16).

22       [8]  "Syncope is temporary loss of consciousness and
    posture, described as 'fainting' or 'passing out.'" Syncope
23  (Fainting), American Heart Association, http://www.heart.org/
    HEARTORG/Conditions/Arrhythmia/SymptomsDiagnosisMonitoringofArrhy
24  thmia/Syncope-Fainting_UCM_430006_Article.jsp (last updated Nov.
    12, 2012). It is usually related to temporary insufficient blood
25  flow to the brain and most often occurs when blood pressure is
    too low or the heart does not pump a normal supply of oxygen to
26  the brain. Id. Plaintiff was diagnosed with neurocardiogenic
    syncope in July 2008. (AR 391.) She was put on medication and
27  apparently did not have any further syncopal episodes. (AR 614.)
28

1    On January 14, 2009, an MRI of Plaintiff's cervical spine
2  was normal, showing "no disc herniation or protrusion[,] no sign
3  of nerve root impingement," and normal signal within the spinal
4  cord.  (AR 316.)  On January 22, 2009, Dr. Lai reviewed
5  Plaintiff's MRI and noted that Plaintiff had a normal gait, no
6  spine tenderness, and normal range of motion, and he repeated his
7  previous diagnoses.  (AR 253-54.)

8    On February 3, 2009, Dr. Bryce Johnson at South County
9  Orthopedic Specialists found that Plaintiff had 5/5 strength,
10  intact sensation, and normal cervical-spine and lumbar-spine
11  MRIs.  (AR 314.)  He noted that he "[did] not see any spine
12  causes of [Plaintiff's] pain" and believed that her best option
13  was pain management.  (Id.)

14    In February 6, 2009, Dr. Lai performed a cervical epidural
15  steroid injection.  (AR 251.)  On February 13, 2009, Dr. Lai
16  noted that Plaintiff had a normal gait, no spine tenderness, and
17  normal range of motion, and he repeated his previous diagnoses.
18  (AR 249-50.)  On February 20, 2009, Dr. Lai again administered a
19  cervical epidural steroid injection.  (AR 247.)  On March 6,
20  2009, Dr. Lai administered a left cervical facet injection.  (AR
21  245.)

22    In March, April, and May 2009, Dr. Lai noted that Plaintiff
23  had a normal gait, no spine tenderness, and normal range of
24  motion.  (AR 239, 242, 259.)  His diagnoses included near
25  cardiogenic syncope, history of spinal-cord injury without
26  radiographic abnormality, cervical spondylosis, cervical disc
27  displacement, myofacial pain, "myalgia/myositis," shoulder
28  osteoarthrosis, left subacromial bursitis, long head biceps

14

tendonitis, and tendinosis of supraspinatus.[9]  (AR 240, 243,
260.)  He advised her to continue taking her medications and
attending physical therapy and issued a home transcutaneous-
electrical-nerve-stimulation unit.  (Id.)  On May 15, 2009, Dr.
Lai administered a left-lumbar facet injection.  (AR 261.)

On June 15, 2009, Dr. Lai completed a one-page physical-
capacities-evaluation check-off form.  (AR 182.)  Dr. Lai checked
the boxes indicating that Plaintiff could sit, stand, or walk for
one hour at a time, for a total of two hours each in an eight-
hour day.  (Id.)  He indicated that she could occasionally lift
or carry five pounds but never more than that.  (Id.)  Dr. Lai
indicated that Plaintiff could never bend, squat, crawl, climb,
or perform activities involving unprotected heights, moving
machinery, marked changes in temperature and humidity, driving
automotive equipment, or exposure to dust, fumes, or gases.
(Id.)  Dr. Lai also indicated that Plaintiff could not use arm
controls or reach with either arm and could not use leg controls
with her left leg.  (Id.)

On June 16, 2009, Dr. Lai completed an application for
discharge of Plaintiff's student loans based on total and
permanent disability.  (AR 180-82.)  He listed Plaintiff's
diagnoses as "SCWIORA (spinal cord injury)" and cervical and
lumbar spondylosis.  (AR 181.)  Although just one day earlier he
had indicated that Plaintiff could sit, stand, or walk for one
hour at a time each, he wrote that Plaintiff could stand for less

---

[9]     The supraspinatus is a shoulder muscle.  Supraspinatus,
Merriam-Webster, http://www.merriam-webster.com
/medical/supraspinatus (last accessed June 17, 2013).

than 15 minutes and had "limited sitting [and] standing tolerance" of less than 20 minutes. (Id.)

On August 13, 2009, Dr. Lai administered trigger-point injections. (AR 590.) In August and October 2009, Dr. Lai noted that Plaintiff had a normal gait, no point tenderness along her spine, normal range of motion, and some neck-muscle tenderness and spasm. (AR 588, 591.) His impression was history of near cardiogenic syncope; history of spinal-cord injury without radiographic abnormality; lumbar facet syndrome; cervical "facet/spondylosis"; cervical disc displacement; "myofacial pain, myalgia/myositis"; shoulder osteoarthrosis; "lumbar facet/spondylosis w/o myelopathy"; and "left subacromial bursitis, long head biceps tendonitis, [and] tendinosis of supraspinatus." (AR 589, 592.) He recommended that she continue taking her medications and attending physical therapy. (Id.)

Between October and December 2009, Dr. Lai administered four sets of trigger-point injections. (AR 584-87.) On December 22, 2009, and February 9, 2010, Dr. Lai performed radiofrequency thermal coagulations while Plaintiff was under intravenous sedation. (AR 578, 582.) In February and March 2010, Dr. Lai administered five sets of trigger-point injections. (AR 573-77.)

On March 22, 2010, Dr. Martinez evaluated Plaintiff for the first time.[10] (AR 565-67.) Dr. Martinez noted that Plaintiff's neck had decreased range of motion, mild tenderness, and

---

[10]   The record does not reflect Dr. Martinez's specialization, if any.

torticollis.[11]   (AR 566.)   She had 5/5 strength throughout, a normal gait, intact sensation, and reflexes of "2+" throughout. (Id.)  He assessed "torticollis, spasmodic," and bilateral cervical dystonia; he recommended Botox injections.[12]   (AR 567.) In April 23, 2010, Dr. Martinez administered a Botox injection. (AR 562-64.)   In May 2010, Dr. Lai administered two more sets of trigger-point injections.  (AR 571-72.)

On May 27, 2010, Dr. Martinez noted that although Plaintiff's Botox injections had initially caused her pain, she was "no longer feeling pain in the neck with 100% relief after the injections."  (AR 560.)   Dr. Martinez noted that Plaintiff had decreased range of motion and torticollis and dystonia of the neck but normal nerves, coordination, station, and gait.  (AR 561.)   He assessed "torticollis, spasmodic," and bilateral cervical dystonia.  (Id.)   That same day, Dr. Martinez completed a one-page physical-capacities-evaluation check-off form, opining that Plaintiff could sit for one hour at a time, for a total of two hours in an eight-hour day; stand for zero hours at a time, for a total of one hour in an eight-hour day; and walk for one hour at a time, for a total of one hour in an eight-hour day. (AR 559.)   Plaintiff could occasionally lift up to 10 pounds,

---

[11]    Torticollis is a twisted neck in which the head is tipped to one side with the chin turned to the other. Torticollis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ ency/article/000749.htm (last updated Mar. 22, 2013).

[12]    Dystonia is a movement disorder that causes involuntary contractions of the muscles, resulting in twisting and repetitive movements that are sometimes painful.  Dystonia, MedlinePlus, http://www.nlm. nih.gov/medlineplus/dystonia.html (last updated May 11, 2012).

1   occasionally carry up to five pounds, and occasionally bend and
2   squat.  (Id.)  Plaintiff could not reach with either arm, crawl,
3   or climb, and she was "mild[ly]" restricted from activities
4   involving changes in temperature and humidity or exposure to
5   dust, fumes, and gases.  (Id.)

6       On June 14, 2010, Dr. Lai noted that Plaintiff had neck-
7   muscle tenderness and spasm and thoracic-facet tenderness but a
8   normal gait, no point tenderness along the spine, and a normal
9   range of motion.  (AR 569.)  Dr. Lai's diagnoses included history
10  of near cardiogenic syncope; history of spinal cord injury
11  without radiographic abnormality; lumbar facet syndrome; "TMJ
12  disorder"; cervical "facet/spondylosis"; cervical disc
13  displacement; "myofacial pain, myalgia/myositis"; shoulder
14  osteoarthrosis; "lumbar facet/spondylosis w/o myelopathy"; and
15  "left subacromial bursitis, long head biceps tendonitis, [and]
16  tendinosis of supraspinatus."  (AR 570.)  Dr. Lai noted that
17  Plaintiff had experienced some improvement from Botox injections
18  and other treatments and recommended that she continue her
19  medications.  (AR 569-70.)

20      At the June 22, 2010 hearing before the ALJ, Dr. Jensen, an
21  orthopedic surgeon, testified that Plaintiff's medical record
22  "present[ed] a rather extensive history of developmental and
23  musculoskeletal problems, as well as evidence of some early
24  learning disabilities, [and] attention deficit disorder."  (AR
25  641, 657-58.)  Dr. Jensen noted that "[f]rom the musculoskeletal
26  standpoint," Plaintiff had cervical pain that appeared to be
27  attributable to degenerative disc disease and a muscular
28  disorder.  (AR 658.)  He noted that EMG and nerve conduction

18

studies had been "essentially . . . nonrevealing" but that Dr. Lai[13] had noted "some sensory decrease and deep tendon reflexes decreased in the upper extremities," and cervical-spine MRIs showed "some multi-level mild degenerative disc disease." (Id.) Dr. Jensen noted that a left-shoulder MRI revealed tendinitis and possible rotator-cuff tear and that Plaintiff had "a long history of some bilateral patellofemoral chondromalacia," which was "early degenerative joint disease." (Id.) Dr. Jensen also noted that Dr. Ferer had believed that Plaintiff had "demonstrated some manifestations of a congenital neuromuscular disorder or Asperger's syndrome." (AR 659.) Dr. Jensen stated that Plaintiff could have a muscle disorder but acknowledged that it had not been established by testing or examination. (AR 663.)

Dr. Jensen opined that Plaintiff's impairments did not meet or equal a Listing but that she nevertheless "would be considerably limited in the workplace." (AR 660.) Dr. Jensen listed Plaintiff's limitations as follows:

> only occasionally lifting and carrying 10 pounds or less than 10 pounds frequently. Her combined standing/walking two hours, sitting six hours in an eight-hour day. Given the opportunity, every 60 minutes at the work site to change position for up to five minutes in addition to the regular work breaks, she could occasionally manage stairs, ramps, could occasionally stoop, crouch, kneel, or crawl, peddle [sic] operation would only be occasional by the foot, use of her upper extremities for gross fine

---

[13]   The transcript of the hearing refers to a "Dr. Lyde," but this appears to be a transcription error. (See AR 658.)

1    manipulation would be frequent but not constant, reaching
2    with the left upper extremity at or above shoulder level
3    would be precluded at any time.

4  (AR 660-61.) Dr. Jensen further opined that Plaintiff was
5  precluded from "constant," but not frequent, neck motion;
6  driving; and working around unprotected heights or moving
7  equipment.  (AR 661-62.)

8    On June 23, 2010, Dr. Lai wrote a letter to the ALJ stating
9  that he had diagnosed Plaintiff with "SCIWORA" – or spinal cord
10 injury without radiographic abnormality – "per her history" and
11 that "her findings [were] consistent [with] SCIWORA."  (AR 594.)
12 He noted that such a diagnosis "can be elusive because it is
13 without radiographic evidence but is accompanied by soft tissue
14 injuries and does have significant sequealae and complications
15 such as the dysautonomia which [Plaintiff] also has."[14]  (Id.)

16   On September 9, 2010, Dr. Suzy Kim at the University of
17 California found that Plaintiff was "ambulatory in the community
18 without any assistive device" and performed her own self-care and
19 activities of daily living.  (AR 615-16.)  Dr. Kim found that
20 Plaintiff had full range of motion in the shoulders, elbows,
21 hands, hips, knees, and ankles; intact cranial nerves; full
22 strength in her right arm and right leg; full strength in her
23 left shoulder, elbow, and wrist but "4+/5" grip strength in her
24 left hand; and "4+/5" strength in the left-lower extremity.  (AR

---

26   [14]   Dysautonomia refers to a disorder of autonomic nervous
27 system function.  NINDS Dysautonomia Information Page, Nat'l
   Inst. of Neurological Disorders and Stroke, http://www.ninds.nih.
28 gov/disorders/dysautonomia/dysautonomia.htm (last updated Sept.
   29, 2011).

616.)  Plaintiff's gait was guarded and slightly slow.  (Id.)
Dr. Kim concluded that Plaintiff had a "constellation of symptoms
and some signs of upper motor neuron injury and autonomic
dysfunction."  (Id.)  She believed that Plaintiff's diagnosis of
spinal-cord injury without radiographic abnormality was "not
certain, given her age and her history of the mechanical fall."
(Id.)  Dr. Kim recommended a comprehensive diagnostic work-up and
aerobic conditioning exercise.  (AR 616-17.)

            3.  Analysis

     In his decision, the ALJ acknowledged that it was
"uncontradicted" that Plaintiff was "not capable of working a
full workweek on a regular and continuous basis without
limitation."  (AR 20.)  Consistent with the testimony of medical
expert Dr. Jensen, however, the ALJ found that Plaintiff could
perform a limited range of sedentary work.  (AR 19.)  In doing
so, the ALJ permissibly accorded "little weight" to the opinions
of two treating physicians, Drs. Martinez and Lai, and "great
weight" to Dr. Jensen's opinion.  (AR 20-21.)

     As an initial matter, the ALJ's RFC finding accommodates
many of the two treating physicians' findings.  For example, the
ALJ found that Plaintiff could stand and walk for a total of only
two hours a day (AR 19), which was largely consistent with Dr.
Martinez's finding that Plaintiff could stand for a total of one
hour and walk for a total of one hour in an eight-hour day (AR
559), and even more limited than Dr. Lai's finding that Plaintiff
could stand and walk for a total of two hours each in an eight-
hour day (AR 182).  The ALJ also found that Plaintiff could only
occasionally stoop, crouch, and kneel (AR 19), which appears

consistent with Dr. Martinez's finding that Plaintiff could occasionally bend and squat (AR 559).  The ALJ found that Plaintiff should avoid driving, unprotected heights, and moving equipment, which was consistent with Dr. Lai's opinion and more limited than Dr. Martinez's.  (AR 19, 182, 559.)  Indeed, in some respects the ALJ's RFC exceeded the limitations found by Drs. Lai and Martinez; for example, the ALJ included requirements that Plaintiff change positions every hour, only occasionally climb ramps and stairs, and avoid constant neck motion.  (AR 19, 182, 159.)

To the extent the two treating physician's opinions were inconsistent with the RFC, moreover, the ALJ provided specific and legitimate reasons for discounting them.  First, the ALJ permissibly rejected the opinions, which were rendered on identical one-page checklist-style forms, because they were "not consistent with the objective medical evidence of record."  (AR 21); see Batson, 359 F.3d at 1195 ("an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings"); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (ALJ may permissibly reject check-off reports that do not contain explanation of basis for conclusions).  Dr. Lai found that Plaintiff's impairments prevented her from, for example, sitting for more than two hours in an eight-hour day, lifting more than five pounds occasionally, and reaching with either

22

arm.[15]   (AR 182.)   Dr. Martinez similarly found that Plaintiff
could not sit for more than two hours total in an eight-hour day,
carry more than five pounds occasionally (although he believed
she could lift up to 10 pounds), or reach with either arm.   (AR
559.)   But as the ALJ noted, the record showed "no objective
evidence of neurological deficits" that would "preclude all
work."   (AR 21.)   Indeed, Plaintiff's lumbar- and thoracic-spine
MRIs, nerve-conduction studies, and electromyography tests were
consistently normal.   (See, e.g., AR 225-26, 286, 228, 483.)
Plaintiff's May 2007 cervical-spine MRI, moreover, showed only
"minor" cervical degenerative-disc changes without any nerve-root
impingement (AR 227), while a January 2009 cervical-spine MRI
showed no disc herniation or protrusion, no nerve-root
impingement, and normal spinal-cord signal (AR 316).   Plaintiff's
many other treating doctors, moreover, generally noted only mild
neurological deficits.   (See, e.g., AR 217 (Dr. Ferer's finding
of reduced reflexes and "mild diffuse upper and lower limb
weakness" with normal sensation and gait); AR 284 (Dr. Dyes's
finding of "occasionally slightly awkward" gait, some slow but
accurate responses and brisk reflexes, and normal motor function,
strength, and sensation); AR 412-13 (Dr. Gordon's finding of

---

[15]    In the physical-capacities-evaluation form, Dr. Lai
indicated that Plaintiff could sit, stand, or walk for one hour
at a time each and for two hours total in an eight-hour day (AR
182), but in the student-loan-discharge form completed the
following day, Dr. Lai stated that Plaintiff could sit and stand
for less than 20 minutes (AR 181).   Such discrepancies also
undermine Dr. Lai's opinion.   See Bayliss v. Barnhart, 427 F.3d
1211, 1216 (9th Cir. 2005) (ALJ permissibly rejected treating
physician's opinion based on discrepancy between it and his other
opinions and observations).

decreased ranges of motion but "5/5" motor function throughout and normal sensation, reflexes, and gait); AR 416 (Dr. Gausewitz's finding of full range of motion of the hip and shoulder and intact neurologic examination); AR 314 (Dr. Johnson's finding of "5/5" strength and intact sensation); AR 615-16 (Dr. Kim's September 2010 finding – the most recent of any of Plaintiff's doctors – of full range of motion in shoulders, elbows, hands, hips, knees, and ankles; full right-arm and right-leg strength; slightly reduced left-hand and left-leg strength; and guarded and "slightly slow" gait).)   Indeed, Drs. Lai's and Martinez's treatment notes also reflect that Plaintiff suffered from few neurological abnormalities.   (See, e.g., AR 256 (Dr. Lai's finding of some diminished reflexes and sensation but normal range of motion, gait, and muscle tone); AR 239, 242, 249, 259 (Dr. Lai's findings of normal gait and range of motion and no point tenderness along spine); AR 561 (Dr. Martinez's finding of decreased left rotation of the neck and torticollis but normal nerves, coordination, station, and gait); AR 566 (Dr. Martinez's finding of decreased right and left rotation of the neck, mild tenderness, and torticollis but "5/5" strength, normal gait, and intact sensation); AR 569 (Dr. Lai's finding of neck-muscle tenderness and spasm but normal gait and range of motion and no point tenderness along spine).)   Such findings fail to support the doctors' conclusions that Plaintiff was so significantly disabled that she was unable to even sit for more than two hours a day.

The ALJ also permissibly rejected Dr. Lai's opinion that Plaintiff could never bend because no evidence indicated that

Plaintiff had "a low back impairment that would preclude all

bending."  (AR 21.)  Plaintiff's thoracic- and lumbosacral-spine

MRIs were normal (AR 225-26), Dr. Martinez concluded that

Plaintiff could "occasionally" bend (AR 559), and Dr. Lai himself

consistently noted that she had full range of motion of the back

(AR 249, 253, 588, 591).  Indeed, in his initial evaluation of

Plaintiff, Dr. Lai specifically found that her spine had normal

range of motion "in all planes" and that she was able to bend,

stoop, and crawl.  (AR 255-56.)  The ALJ also rejected Dr.

Martinez's opinion because no evidence showed that Plaintiff

"must constantly lay down during a normal day."  (AR 21.)

Indeed, although Dr. Martinez found that Plaintiff could sit for

only two hours, stand for only one hour, and walk for only one

hour in an eight-hour day (AR 559), no evidence supported such a

limited assessment, and Dr. Martinez provided no explanation for

his finding on the check-off form.  See Molina, 674 F.3d at 1111.

     Finally, the ALJ was entitled to rely on Dr. Jensen's

opinion rather than the opinions of Drs. Lai and Martinez because

Dr. Jensen's opinion was consistent with the objective evidence,

including the findings of the other treating doctors.  Thomas,

278 F.3d at 957 ("The opinions of non-treating or non-examining

physicians may also serve as substantial evidence when the

opinions are consistent with independent clinical findings or

other evidence in the record."); Morgan v. Comm'r of Soc. Sec.

Admin., 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a

nonexamining, testifying medical advisor may serve as substantial

evidence when they are supported by other evidence in the record

and are consistent with it" (citing Andrews v. Shalala, 53 F.3d

1   1035, 1041 (9th Cir. 1995))); see 20 C.F.R. §§ 404.1527(c)(4)
2   (ALJ will generally give more weight to opinions that are "more
3   consistent . . . with the record as a whole"), 416.927(c)(4)
4   (same).  For example, Dr. Jensen accurately noted that
5   "[e]lectrodiagnostic studies have essentially been non-revealing"
6   and that Plaintiff had not been diagnosed with radiculopathy.
7   (AR 658.)  Dr. Jensen noted that one of Plaintiff's doctors had
8   "noticed some sensory decrease and deep tendon reflexes decreased
9   in the upper extremities" and that a cervical-spine MRI had shown
10  "mild degenerative disc disease." (Id.)  Dr. Jensen also noted
11  Plaintiff's history of left-shoulder tendinitis and bilateral
12  patellofemoral chrondomalacia of the knees. (Id.)  He noted that
13  "there appears to be . . . some sort of congenital . . . muscular
14  disorder" but acknowledged that such a diagnosis had not been
15  established by testing or examination. (AR 663.)  Consistent
16  with those impairments, Dr. Jensen found that Plaintiff would be
17  "considerably limited in the workplace" and listed several
18  specific limitations (AR 660-63), which were later reflected in
19  the ALJ's RFC assessment (AR 19).  Dr. Jensen also testified that
20  he had reviewed Dr. Martinez's opinion and found that his
21  limitations on lifting and sitting were not necessary or
22  appropriate (AR 662); as discussed above, the objective evidence
23  indeed fails to support Dr. Martinez's findings of extreme
24  workplace limitations.

25      Moreover, Dr. Jensen, unlike Drs. Lai and Martinez, reviewed
26  all the medical evidence up to the date of the hearing before
27  rendering his opinion. (AR 641-42); see 20 C.F.R.
28  §§ 404.1527(c)(6) (extent to which doctor is "familiar with the

other information in [claimant's] case record" is relevant factor

in determining weight given to opinion), 416.927(c)(6) (same).

The ALJ could also credit Dr. Jensen's opinion because he

testified at the hearing, heard Plaintiff's testimony, and was

subject to cross-examination.  See Andrews, 53 F.3d at 1042

(greater weight may be given to nonexamining doctors who are

subject to cross-examination).  Any conflict in the properly

supported medical-opinion evidence was the sole province of the

ALJ to resolve.  See id. at 1041.

Plaintiff is not entitled to remand on this claim.

B.   The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff contends that the ALJ failed to provide clear and

convincing reasons for his adverse credibility determination.

(J. Stip. at 11-15, 19-20.)  For the reasons discussed below,

however, reversal is not warranted based on the ALJ's alleged

failure to make proper credibility findings or properly consider

Plaintiff's subjective symptoms.

1.   Applicable law

An ALJ's assessment of pain severity and claimant

credibility is entitled to "great weight."  See Weetman v.

Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

believe every allegation of disabling pain, or else disability

benefits would be available for the asking, a result plainly

contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina, 674 F.3d at 1112.

In evaluating a claimant's subjective symptom testimony, the ALJ

engages in a two-step analysis.  See Lingenfelter, 504 F.3d at

1035-36.  "First, the ALJ must determine whether the claimant has

27

presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." <u>Id.</u> at 1036 (internal quotation marks omitted).   If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the <u>degree</u> of symptom alleged." <u>Smolen</u>, 80 F.3d at 1282 (emphasis in original).   When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion. <u>See</u> <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).   Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Lester</u>, 81 F.3d at 834.   If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at 959.

                    2.   <u>Relevant facts</u>

     In an exertional questionnaire dated June 6, 2008, Plaintiff wrote that she lived in her own apartment near college but would be moving home after graduation. (AR 156.)   She stated that her left shoulder, left arm, left leg, and left foot had "nerve pain," numbness, tingling, and muscle problems and that her arm could not bear any weight. (<u>Id.</u>)   She said it could take her "several hours" to get ready to go somewhere. (<u>Id.</u>)   Plaintiff said she could climb two flights of stairs to attend one of her classes, but it was "difficult." (AR 157.)   She shopped for groceries twice a month, drove to school and the grocery store, and cleaned her apartment over a three-day period. (<u>Id.</u>)   She

said she took four- to five-hour naps three or four times a week and used a cane two or three times a week.  (AR 158.)

In an April 2009 function report, Plaintiff wrote that her daily activities included eating breakfast that her family prepared, showering, sitting outside with her dog, reading books, napping, putting ice or heat on her back, going to doctors' appointments, making lunch, eating dinner, feeding her dog, and watching television.  (AR 107-08.)  She said she sometimes needed help taking off her coat, fixing her hair, and cutting her food.  (AR 108.)  Plaintiff wrote that she could put laundry into the machines but couldn't fold it.  (AR 109.)  She went outside every day, could go out alone, and shopped about once a week for about an hour at a time.  (AR 110.)  She said she was unable to pay bills, count change, or handle a savings account but could write and use checks and had no problem reading.  (AR 110-11.)  Plaintiff said that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, follow instructions, and use her hands.  (AR 112.)  She could walk "a short distance" before needing to rest for 15 to 20 minutes.  (Id.)  Plaintiff said she couldn't handle stress or changes to her routine very well and that she used a cane if she had to walk "any great distance."  (AR 113.)

In an August 2009 disability report, Plaintiff wrote that she had trouble with buttons and snaps because of numbness in her hands, had difficulty bending over to put on shoes and pants, and needed to lie down or recline often during the day.  (AR 94.)  In an undated disability report, Plaintiff wrote that she had

"[c]ompressed discs" and "degeneration" in her neck, nerve damage in her left arm and leg, nerve pain, shoulder tendonitis, and other conditions.  (AR 79.)  As a result, Plaintiff said, she could not carry or lift, sitting was uncomfortable, she was constantly in pain and fatigued, and she was "having problems with depression."  (Id.)

At the June 2010 hearing before the ALJ, Plaintiff testified that she could not work because of a spinal-cord injury, joint problems, and "back injuries."  (AR 645.)  She said that since her accident in February 2007, she had experienced daily pain in her neck, shoulders, and upper, middle, and low back.  (AR 651-52.)  Plaintiff said she had muscle spasms in her neck, shoulders, and back almost every day, which were alleviated with Valium.  (AR 652-53.)  She had numbness in her left arm and left leg, which was controlled by her radio-frequency treatments.  (AR 653-54.)  Plaintiff testified that she could lift only five pounds, sit for 25 to 30 minutes, stand still for about five minutes, "stand[] and move[]" for about 35 minutes, and walk for 30 to 45 minutes.  (AR 654-56.)

Plaintiff testified that she usually slept until 11 a.m. or noon each day, spent at least four hours a day lying down or reclining, and sometimes had "four or five days of straight headaches."  (AR 647, 654.)  Plaintiff testified that she used a computer for email, watching movies, and Facebook.  (AR 650.)  She had not tried to get a job in the previous two years because she wasn't "really sure how long [she] would be able to retain that job."  (AR 650-51.)

30

3.   Analysis

The ALJ accommodated many of Plaintiff's subjective complaints by finding that she had an RFC for only a limited range of sedentary work.  (See AR 20-21.)  For example, the ALJ found that "even lifting and carrying light objects would cause [Plaintiff] increased pain symptoms" and therefore limited her to only "sedentary lifting and carrying," which involved lifting no more than 10 pounds at a time and "occasionally lifting or carrying articles like docket files, ledgers, and small tools." (AR 20); 20 C.F.R. §§ 404.1567(a), 419.967(a).  The ALJ noted that Plaintiff "complained of problems standing" and therefore limited her to only two hours of standing and walking in an eight-hour day.  (AR 20-21.)  He also found that Plaintiff needed to change positions every hour "to help prevent the onset of pain symptoms that can arise with prolonged sitting, standing, or walking" and included a variety of other limitations expressly to avoid exacerbating Plaintiff's "pain symptoms."  (AR 21.)

To the extent Plaintiff's subjective symptom testimony was inconsistent with the RFC assessment, however, the ALJ properly discredited it. (AR 20-22.)  First, the ALJ's finding that some of Plaintiff's alleged symptoms were "inconsistent with the objective medical evidence of record" was a clear and convincing reason for discounting her credibility.  (AR 21); see Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged symptoms are consistent with the medical evidence"); Burch v. Barnhart, 400

31

F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir. 2009) (same).  Indeed, as the ALJ found (AR 21), Plaintiff claimed to have "[c]ompressed discs in the neck" and "nerve damage in the left arm and leg" in addition to her cervical-spine degeneration (AR 79), but her nerve-conduction and electromyography tests were normal (AR 286, 483) and her two cervical-spine MRIs showed only "degenerative disc changes in the cervical spine without evidence of impingement" (AR 227 (emphasis added)), "no disc herniation or protrusion and no sign of nerve root impingement," and normal signal within the spinal cord (AR 316).  And as the ALJ noted (AR 21), Plaintiff also alleged that she could not "feel [her] left foot" because of "numbness," which made walking and standing difficult (AR 79), but her doctors consistently noted that she had intact sensation and normal neurological exams (see, e.g., AR 217, 224, 284, 314, 412, 414, 416, 566).  Moreover, the physician who most recently examined Plaintiff, Dr. Kim, noted that she was "ambulatory in the community without any assistive device," "independent in self-care and activities of daily living," "well appearing," and "alert and articulate."  (AR 615.)

Second, the ALJ noted that Plaintiff "attempt[ed] to rely on the statements of her mother," who alleged, among other things, that Plaintiff "use[d] a cane for prolonged ambulation."  (AR 22, 121.)  Indeed, Plaintiff herself also alleged that she used a cane a few times a week or for prolonged walking.  (See AR 113,

158.)  But as the ALJ found (AR 22), no evidence indicated that
Plaintiff needed to use a cane to walk; on the contrary,
Plaintiff's doctors frequently found that she walked with a
normal unassisted gait (see, e.g., AR 217 (normal gait), 239-40
(normal gait), 242-43 (normal gait), 249 (normal gait), 253
(normal gait), 256 ("[n]ormal gait pattern without assistive
device or braces"), 259 (normal gait), 413-14 (normal gait), 484
("heel walk, toe walk done normally"), 561 (normal gait), 566
(normal gait), 569 (normal gait), 588 (normal gait), 591 (normal
gait); see also AR 255 (did not use cane or walker); AR 284
(normal but "occasionally slightly awkward" gait); AR 615-16
(guarded and "slightly slow" gait but "ambulatory in the
community without any assistive devices")).   The ALJ therefore
permissibly discounted Plaintiff's credibility on this ground.
See Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (ALJ
properly discounted credibility when claimant "walked slowly and
used a cane at the hearing" even though no doctors indicated he
used or needed assistive device and two doctors noted he did not
need one); Castaneda v. Astrue, 344 F. App'x 396, 398 (9th Cir.
2009) (ALJ properly discounted credibility when claimant said he
used cane and back brace but was not using devices at hearing and
"no doctor had prescribed the use of a cane").

     One of the ALJ's reasons for discounting Plaintiff's
credibility, however, may not have been clear and convincing.
The ALJ found that Plaintiff's credibility was "affected by the
lack of any work history and documentation of efforts to at least
attempt work" since her fall in February 2007.  (AR 22.)
Although an ALJ is permitted to consider a claimant's work

history in assessing credibility, <u>see</u> <u>Thomas</u>, 278 F.3d at 959

(ALJ permissibly discounted credibility because claimant had

"extremely poor work history" and had "shown little propensity to

work in her lifetime"), here the ALJ failed to note that

Plaintiff had a part-time job as a sales clerk at a retail store

until June 2007, apparently while she was also attending college

and living alone in her own apartment (AR 129, 156, 647).[16]  Any

error in the ALJ's reasoning was harmless, however, because he

gave other clear and convincing reasons supporting his

credibility assessment.  <u>See</u> <u>Bray v. Comm'r of Soc. Sec. Admin.</u>,

554 F.3d 1219, 1227 (9th Cir. 2009); <u>Carmickle</u>, 533 F.3d at 1162.

Plaintiff is not entitled to remand on this ground.

---

[16]     Although the fact that Plaintiff was apparently able to
work, attend college classes, and live alone in an apartment
after her allegedly debilitating fall tends to indicate that her
complaints of being totally disabled may not be fully credible,
the ALJ did not rely on that fact; thus, this Court does not
either.   <u>See</u> <u>Connett v. Barnhart</u>, 340 F.3d 871, 874 (9th Cir.
2003) (court may not affirm ALJ's credibility decision based on
reasons ALJ did not assert).

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[17] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.


DATED: June 24, 2013

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

--------

[17]     This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

35